**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 30, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

     No. 10-8075

CESAR ACOSTA-GALLARDO,

      Defendant - Appellant.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 2:09-CR-00355-ABJ-2)**

---

Chris T. Rasmussen, Rasmussen & Kang, Las Vegas, Nevada, for the Appellant.

Stephanie I. Sprecher, Assistant United States Attorney (Christopher A. Crofts, United States Attorney, and David A. Kubichek, Assistant United States Attorney, with her on the brief), Office of the United States Attorney for the District of Wyoming, for the Appellee.

---

Before **GORSUCH, HOLLOWAY** and **MATHESON**, Circuit Judges.

---

**HOLLOWAY**, Circuit Judge.

---

     This appeal follows a jury conviction of defendant-appellant Cesar Acosta-Gallardo on one count of conspiracy to traffic in methamphetamine, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A) (collectively, Count

One), and on one count of using a telephone to facilitate a felony drug offense, in violation of Title 21, United States Code Section 843(b) (Count Eleven). Acosta-Gallardo appeals his conviction, alleging a variance, a *Brady* violation, improper venue, and that insufficient evidence was presented to sustain his Count One conviction for alleged trafficking in methamphetamine. Exercising jurisdiction of this appeal pursuant to Title 28, United States Code, Section 1291, we affirm.

## I. Facts

Drug Distribution Activity

Much of the evidence against Acosta-Gallardo was introduced through the testimony of co-defendant Alvaro Alvarado-Sanabria ("Alvarado"). Alvarado was arrested on October 13, 2009, and as part of his plea agreement that followed, he agreed to provide information on people with whom he dealt in drugs.

At the time of his arrest, Alvarado had been involved in distributing methamphetamine for roughly three years. Alvarado testified that he was first exposed to dealing in methamphetamine through a man named Alfredo Garcia, who imported drugs from Mexico. Alvarado and Garcia first became acquainted in late 2006 or early 2007 when Garcia came to Alvarado's place of employment, looking for work. Alvarado helped Garcia find employment and also let him a room. As they became better acquainted, Alvarado agreed to lend Garcia money at a favorable interest rate. After loaning Garcia money three or four times, Alvarado found out that Garcia was using the money to purchase methamphetamine for distribution. R., Vol. 3 at 144-45. Alvarado

testified that in the beginning, he was just loaning money to Garcia as an investment. *Id.* at 145-46.

Garcia returned to Mexico several times a year and Alvarado took over the methamphetamine distribution operation. Alvarado testified that he and Garcia were like "partners." He became acquainted with Garcia's driver, who transported the methamphetamine to Utah. Alvarado also met Garcia's customers. Alvarado testified that he and Garcia had three sources for obtaining methamphetamine: (1) a source called "Police," (2) Juvenal Garcia (a co-defendant), and (3) the defendant, Acosta-Gallardo.

In the beginning, Alvarado had only one buyer, Brahnson Arnell. Arnell lived in Lyman, Wyoming. Alvarado testified that his only reason for communicating with Arnell was to sell him methamphetamine. Alvarado sold methamphetamine to Arnell for approximately three years. Arnell introduced Alvarado to some of his customers in Wyoming so that Alvarado could deal directly with them. These customers included Alvarado's co-defendants, Robert Landry, Charles Thunehorst, Charles Jerabek, Jason Freeman, and Matthew Owens. Alvarado estimated that between 2007 and 2009, he sold two to four pounds of methamphetamine to Landry, five to eight pounds to Thunehorst, and roughly three to four pounds to Owens. In turn, some of these customers sold methamphetamine to their own customers. For example, Landry sold methamphetamine he received from Alvarado to Freeman, George Burkett, Tommy Burkett, Kevin Watson, and others.

Alvarado testified he would deliver methamphetamine to his Wyoming customers

at one of several pre-arranged meeting places off of Interstate 80 between Salt Lake City, Utah, and Rock Springs, Wyoming.  R., Vol. 5 Ex. 103; R., Vol. 3 at 336-40.  Each location was assigned a code number, and the delivery location would be communicated by referencing the location's code number.

Alvarado and Defendant Cesar Acosta-Gallardo

During one of his stays in Utah, Garcia told Alvarado about Acosta-Gallardo, who was from his home town in Mexico and needed a place to live.  Alvarado owned several condos and apartments at the time and let one of them to Acosta-Gallardo.  Garcia informed Alvarado that Acosta-Gallardo "was someone really important in the drugs," "that [Acosta-Gallardo] was able to get like big quantities [of drugs]," and that "[Acosta-Gallardo] was able to be a resource."  R., Vol. 3 at 152.  Prior to this, Alvarado's main source of methamphetamine had been Juvenal Garcia.  Alvarado testified, however, that Juvenal Garcia was unable to get the methamphetamine that Alvarado needed.  *Id.* at 153-54.  As a result, in the summer of 2007, Alvarado and Alfredo Garcia began acquiring their methamphetamine from Acosta-Gallardo.

Alvarado and Garcia would obtain pounds of methamphetamine from Acosta-Gallardo and resell it to their customers in smaller amounts.  Alvarado testified that he purchased methamphetamine from Acosta-Gallardo once every one to two months.  *Id.* at 163.  Most of the time, Defendant Acosta-Gallardo would advance Alvarado the methamphetamine on credit and Alvarado would pay him for it later.  *Id.* at 164.

Alvarado testified that after he ordered methamphetamine from Acosta-Gallardo,

Acosta-Gallardo would contact him a few days later and would then either deliver the methamphetamine himself or send his driver. Alvarado would sometimes help retrieve the methamphetamine from the delivery vehicle, where it was usually concealed in the engine compartment between the windshield and the engine. Alvarado testified that in 2007 and 2008, when he lived in Park City, Utah, his apartment complex had an underground garage where he and Acosta-Gallardo could retrieve the drugs from the vehicle without being seen from the outside.

Alvarado stored the methamphetamine he received from Acosta-Gallardo in a brown suitcase that was kept in a closet in his (Alvarado's) residence. *Id.* at 176-78. Alvarado stored different purchases of methamphetamine in separate containers. *Id.* at 178-80. At trial, Alvarado was shown a photograph of the contents of the suitcase seized from his apartment. R., Vol. 5, Ex. 115. In the photograph, Alvarado identified three different packages of methamphetamine that he had received from Acosta-Gallardo. R., Vol. 3 at 181-82. Alvarado testified that Acosta-Gallardo had seen the suitcase many times, and that Acosta-Gallardo was aware that Alvarado kept methamphetamine in that suitcase. *Id.* at 184-85.

Phone Exchanges Between Alvarado and Acosta-Gallardo

Alvarado testified that he kept two cell phones. One phone was for personal use. The other phone was his "business phone," R. Vol. 3 at 188, which he changed every four to six weeks to avoid tracking by law enforcement. *Id.* at 185. Acosta-Gallardo's contact information was kept in Alvarado's business phone. Alvarado testified that between 2007

and 2009, he changed phones approximately fifteen to twenty times. He purchased his business phones from Wal-Mart. The phones were never registered in Alvarado's name. In order to be assigned a phone number, Alvarado would provide a zip code from Idaho, Colorado, or Wyoming so that his assigned phone number would correspond to that zip code. Alvarado never provided the zip code of the city where he actually lived.

At trial, the government introduced the transcript of a text message that Alvarado received from Acosta-Gallardo on September 11, 2009. R., Vol. 3 at 192-93; R., Vol. 5 Ex. 123. The message, translated into English from Spanish, stated, "Dude, there is a [Female] friend that is 18 years old if you want to meet her." R., Vol. 5, Ex. 123. Alvarado testified that "amiga," or "female [friend]," meant that Acosta-Gallardo had one pound of methamphetamine. R., Vol. 3 at 192. The reference to "18" meant "18,000." *Id.* Thus, Alvarado testified that Acosta-Gallardo's message communicated the idea that he had "a pound of meth for $18,000, and he want[ed] to know if I wanna, I wanna [sic] buy that from him." *Id.*

Transcripts of several phone conversations that took place on September 12, 2009 were next introduced at trial. R., Vol. 5 at Exs. 124, 125, 126. The transcripts reflected both the conversations, all of which took place in Spanish, and their English translations. R., Vol. 3 at 189. The first phone conversation is dated September 12, 2009, and time-stamped "17:34:47 MDT - 17:36:02 MDT." R., Vol. 5 Ex. 124. Alvarado testified that in this conversation, he and Acosta-Gallardo were coordinating the delivery of drugs mentioned in the September 11, 2009 text message. Alvarado testified that in this phone

conversation, he was communicating to Acosta-Gallardo that he (Alvarado) was not yet at home.  R., Vol. 3 at 194-95.

The second phone conversation is also dated September 12, 2009, and is time-stamped "19:39:22 NDT - 19:39:58 MDT."  R., Vol. 5 Ex. 125.  During this phone conversation, Alvarado contacted Acosta-Gallardo to tell him that he had just arrived home.  R., Vol. 3 at 196.  Acosta-Gallardo's response, as explained by Alvarado, indicated that Acosta-Gallardo was on his way to meet Alvarado.  *Id.*

The third phone call was similarly dated September 12, 2009, and time-stamped "20:07:58 MDT - 20:08:36 MDT."  R., Vol. 5 Ex. 126.  Alvarado explained that this phone conversation took place a few minutes before Acosta-Gallardo arrived at Alvarado's home.  R., Vol. 3 at 197-98.  Alvarado explained that Acosta-Gallardo asked where to park, and Alvarado directed Acosta-Gallardo to the parking lot behind his apartment.  *Id.* at 198.

Alvarado testified that after these three phone conversations, Acosta-Gallardo delivered eight ounces of methamphetamine to him.  *Id.*  The drugs were advanced to him on credit.  *Id.*  Alvarado stored the drugs in one of the containers in his suitcase and eventually sold it to his customers, most of whom were in Wyoming.  *Id.* at 198-99.

The transcript of an additional phone conversation between Acosta-Gallardo and Alvarado, dated September 16, 2009, and time-stamped "11:22:26 MDT - 11:29:20 MDT," was introduced into evidence by the government.  R., Vol. 5 at Ex. 127.  Alvarado initiated this phone call to Acosta-Gallardo and told him, "it is pretty, I've been told that

it truly rocks." R., Vol. 3 at 199-200; R., Vol. 5 Ex. 127 at page 2, line 8. Alvarado testified that his comment meant that the quality of the drugs he obtained from Acosta-Gallardo on September 12, 2009 was "quite good." R., Vol. 3 at 199-200. Acosta-Gallardo responded (in Spanish), "I told you, you were going to like it." *Id.* at 200-201; R., Vol. 5 Ex. 127 at page 2, line 11. Alvarado then communicated to Acosta-Gallardo, in code, that it would take him a few days to collect the money owed for the September 12, 2009 drug delivery. R., Vol. 3 at 202; R., Vol. 5 Ex. 127 at page 2, line 18. Alvarado testified that Acosta-Gallardo's response indicated that he was agreeable to that arrangement. *Id.* (discussing R., Vol. 5 at page 2, line 19).

Alvarado testified that a week after the September 12, 2009 drug transaction, he paid Acosta-Gallardo $4,500, half of the amount due for the eight ounces of methamphetamine delivered. *Id.* at 224-25. Then, on October 12, 2009, a day before Alvarado was arrested, Alvarado paid Acosta-Gallardo the remaining $4,500 due for the September 12, 2009 delivery. *Id.*

The Investigation

Federal agents made two controlled purchases from Alvarado. On September 24, 2009, an undercover agent purchased four ounces of methamphetamine for $6,000 using marked bills. Of the $6,000 paid, $1,200 in marked funds was later recovered from Acosta-Gallardo's vehicle. R., Vol. 3 at 96-99. On October 13, 2009, an undercover agent made the second controlled purchase of eight ounces of methamphetamine for $11,000. *Id.* at 95-96. Immediately following this purchase, Alvarado was arrested.

A DEA agent testified that an estimated forty pounds of methamphetamine was at issue over the course of the investigation. *Id.* at 534. Using the lowest purity level found in the drugs seized from Alvarado, which was a 7.2% purity of methamphetamine, forty pounds of methamphetamine would be equivalent to over 50 grams of "actual" methamphetamine. *Id.* at 534-35. The DEA agent estimated that over ten pounds of methamphetamine were attributable to Acosta-Gallardo. *Id.*

## II.  Analysis

Acosta-Gallardo appeals his conviction on four grounds. First, he argues that there was a variance between his indictment and the facts proven at trial. Second, he argues that the government committed a violation of his rights as recognized in *Brady v. Maryland*, 373 U.S. 83 (1963), by belatedly disclosing Alvarado's proffered testimony that Acosta-Gallardo handled Alvarado's glass methamphetamine storage jars. Third, Acosta-Gallardo argues that the government failed to prove that venue was proper for Counts One and Eleven by a preponderance of the evidence. Fourth, Acosta-Gallardo argues that the government failed to prove beyond a reasonable doubt that there was interdependence among him, Alvarado, and Alvarado's Wyoming customers. Only the third issue merits prolonged discussion but we address each of the arguments in turn.

1. <u>Whether a variance in the evidence established facts different from those alleged in Count Eleven</u>

Count Eleven charged Acosta-Gallardo with the following:

On or about September 12, 2009, at approximately 5:34 p.m., 7:39 p.m., and 8:07 p.m. in the District of Wyoming, the Defendants, Alvaro Alvarado-

- 9 -

Sanabria and Cesar Acosta-Gallardo, did knowingly, intentionally, and unlawfully use a communication facility, to wit: a telephone, in causing or facilitating the commission of acts constituting a felony under the federal controlled substance act, to wit: conspiracy to possess with the intent to distribute, and to distribute, methamphetamine, in violation of 21 U.S.C. § 846, as more fully alleged in Count One of this Indictment. In [sic] violation of 21 U.S.C. § 843(b).

R., Vol. 1 at 28. Acosta-Gallardo argues that the evidence used in the government's case to demonstrate that Acosta-Gallardo used a communication facility in furtherance of a conspiracy actually involved phone calls of October 12, 2009, not September 12, 2009, as charged in the indictment. Acosta-Gallardo argues that this amounted to a variance, and that no reasonable jury could have found Acosta-Gallardo guilty of Count Eleven.

"A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." *United States v. Ailsworth*, 138 F.3d 843, 848 (10th Cir. 1998) (quoting *United States v. Edwards*, 69 F.3d 419, 432 (10th Cir. 1995)). We review de novo the question whether a fatal variance occurred, viewing the evidence and drawing all reasonable inferences in the light most favorable to the government. *United States v. Caldwell*, 589 F.3d 1323, 1328 (10th Cir. 2009) (citing *United States v. Carnagie*, 533 F.3d 1231, 1237 (10th Cir. 2008)). However, a "variance is reversible error only if it affects the substantial rights of the accused." *Ailsworth*, 138 F.3d at 848 (quoting *Berger v. United States*, 295 U.S. 78, 82 (1935)).

Because we are convinced that no variance occurred, we need not reach the issue of Acosta-Gallardo's substantial rights. As recounted above, the government introduced the transcripts of three phone conversations between Alvarado and Acosta-Gallardo that

took place on September 12, 2009. At trial, Alvarado explained the context of those phone calls and how they facilitated Acosta-Gallardo's delivering eight ounces of methamphetamine to him on September 12, 2009. Alvarado further testified that he sold that methamphetamine to his customers, at least some of whom were in Wyoming. Thus, the evidence introduced at trial did not establish facts different from those alleged in the indictment. Accordingly, there was no variance.

2. Whether the Government Failed to Present Knowledge of Potentially Exculpatory Evidence Prior to Trial in Violation of *Brady v. Maryland*, 373 U.S. 83 (1963)

Acosta-Gallardo next argues that the government committed a *Brady* violation because it delayed disclosing Alvarado's proffer that Acosta-Gallardo handled the glass methamphetamine storage jars kept in the brown suitcase seized from Alvarado's apartment.[1] Aplt's Br. at 13-14; Oral Argument 2:18 to 3:43. To succeed on his *Brady* claim, Acosta-Gallardo must demonstrate that the prosecution suppressed evidence, that the evidence was favorable to him, and that the evidence was material. *United States v. Smith*, 534 F.3d 1211, 1222 (10th Cir. 2008) (citing *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir. 1999)). Under *Brady*, evidence is material if it "creates 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.'" *Id.* (quoting *Scott v. Mullin*, 303 F.3d 1222,

---

[1] In his brief, Acosta-Gallardo suggested that the government also committed a *Brady* violation by failing to conduct a fingerprint analysis of the glass jars. Aplt's Br. at 13-14. Counsel for Acosta-Gallardo clarified at oral argument that this argument was not at issue. Oral Argument 2:18 to 3:43. Accordingly, we do not address it.

1230 (10th Cir. 2002)). A "reasonable probability" is a "'probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting same)

The glass jars at issue were seized from Alvarado's apartment on October 13, 2009. R., Vol. 3 at 505-06. The government represented that it learned, at most one week prior to trial, that Alvarado would testify that Acosta-Gallardo handled the glass jars and communicated that to Acosta-Gallardo at most four to five days later. Oral Argument 12:26-13:25. A DEA agent testified at trial that the glass jars were not fingerprinted because the agent found out just before trial that Acosta-Gallardo may have handled them. R., Vol. 3 at 610-11. Acosta-Gallardo indicates that he learned of Alvarado's proffer the day before trial, and had he known about it sooner, he would have requested a continuance and had the jars fingerprinted because the results of the fingerprint analysis "would have been exculpatory to both innocence or guilt." Aplt's Br. 13.

Acosta-Gallardo's arguments, however, fall short of establishing a *Brady* violation. Assuming *arguendo* that the government did delay disclosing Alvarado's testimony to Acosta-Gallardo, and that Acosta-Gallardo would have had the jars fingerprinted, no one knows whether the results would have been favorable to Acosta-Gallardo. This fails to satisfy the second prong of *Brady*.

Additionally, Acosta-Gallardo does not establish a reasonable probability that the outcome of the proceedings would have been different if the jars had been fingerprinted. If Acosta-Gallardo's fingerprints had been on the jars, Alvarado's testimony would have been corroborated. On the other hand, if Acosta-Gallardo's fingerprints were not on the

jars, that could have meant anything "from the failure of the fingerprints to be preserved, Mr. Alvarado-Sanabria's innocent misrecollection about whether [Acosta-Gallardo] handled the item, to the fingerprints never being preserved in any readable format in the first place." R., Vol. 1 at 355 (Order Denying Motion for Acquittal July 23, 2010 at 6). As the district court phrased it, "absence of evidence is not evidence of absence." *Id.*. Thus, Acosta-Gallardo has failed to establish any *Brady* violation.

   3. <u>Whether Venue was Proper for Counts One and Eleven</u>

Acosta-Gallardo next argues that venue for Counts One and Eleven was improper in the District of Wyoming. Moreover, Acosta-Gallardo argues that the district court's failure to instruct the jury on venue constituted structural error and is per se reversible. Aplt's Br. at 14.

<u>Whether A Reasonable Jury Could Have Found Venue by a Preponderance of the Evidence</u>

The Constitution contains two provisions on venue in criminal cases. *United States v. Medina-Ramos*, 834 F.2d 874, 875 (10th Cir. 1987). "Article III, § 2, cl. 3 requires that the trial of any crime be held in the state in which the crime was committed, while the Sixth Amendment requires that trial be by a jury of the state and district in which the crime was committed." *Id.* at 875-76. "These directives are the product of the Framers' concern over 'the unfairness and hardship to which trial in an environment alien to the accused exposes him.'" *Id.* at 876 (quoting *United States v. Johnson,* 323 U.S. 273, 275 (1944)). Similarly, Federal Rule of Criminal Procedure 18 states that "'[e]xcept as

otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed.'" *See also Medina-Ramos*, 834 F.3d at 876 (quoting Fed. R. Crim. P. 18).

"Although venue is a right of constitutional dimension, and has been characterized as 'an element of every crime,' . . . [it] need not be proved beyond a reasonable doubt." *United States v. Miller,* 111 F.3d 747, 749 (10th Cir. 1997) (quoting *United States v. Winship*, 724 F.2d 1116, 1124 (5th Cir. 1984)). Rather, venue need only be proven by a preponderance of the evidence. *Id.* at 749-50 (citing *United States v. Record*, 873 F.2d 1363, 1366 (10th Cir. 1989)). Venue is a question of fact ordinarily decided by the jury. *Id.* at 749 (citing *United States v. Rinke*, 778 F.2d 581, 584 (10th Cir. 1985)). However, "[w]hether the government presented sufficient evidence to support a jury's finding on venue is a question of law." *United States v. Kelly,* 535 F.3d 1229, 1232 (10th Cir. 2008) (citing *Miller*, 111 F.3d at 749). "In reviewing whether venue lies in a particular district . . . [we] view[] the evidence in the light most favorable to the government and mak[e] all reasonable inferences and credibility choices in favor of the finder of fact." *Id.* at 1232-33 (citing *Rinke*, 778 F.2d at 584).

### Count One

Count One charges Acosta-Gallardo and his co-defendants with "knowingly, intentionally, and unlawfully combin[ing], conspir[ing], confederat[ing] and agree[]ing, to possess with intent to distribute, and to distribute, 50 grams or more of methamphetamine (actual), a Schedule II controlled substance." R., Vol. 1 at 24. Venue

- 14 -

for a conspiracy is proper in any jurisdiction where an overt act in furtherance of a conspiracy was committed by any of the conspirators, even if the defendant has "neither been to the jurisdiction nor committed any acts there." *Miller*, 111 F.3d at 753 n.8 (citing *United States v. Smith*, 692 F.2d 693, 697 (10th Cir. 1982)); *see also United States v. Hamilton*, 587 F.3d 1199, 1207 (10th Cir. 2009) (collecting cases).

In this case, the government introduced ample evidence that numerous overt acts in furtherance of the methamphetamine distribution conspiracy took place in the District of Wyoming. Alvarado met his customers at stops along Interstate 80 to deliver drugs in both Utah and Wyoming. The testimony of several co-defendants corroborated this. For example, co-defendant Jason Freeman, who resided in Wyoming, testified that he would meet Alvarado in "Pilot in Evanston," and "TA in . . . Fort Bridger." R., Vol. 3, Tr.[2] at 756, 763. When Freeman was shown a map marking various stops along I-80 between Utah and Wyoming, R., Vol. 5 Ex. 103, Freeman testified that he recognized the places outlined on the map. R., Vol. 3, Tr. at 764. One stop was marked "Evanston, WY." *Id.*; R., Vol. 5 Ex. 103. Similarly, a point marked "TA Truckstop" was located in Wyoming. A reasonable jury could have inferred that Freeman met Alvarado in Evanston, Wyoming and at the TA Truckstop in Wyoming, where Alvarado distributed drugs in furtherance of the methamphetamine distribution conspiracy.

---

[2] A portion of Volume 3 of the record on appeal is inexplicably unpaginated. For this portion, we will reference the original pagination of the trial transcript, denoted by "R., Vol. 3, Tr."

Additionally, Arnell, Alvarado's first customer, lived in Lyman, Wyoming. R., Vol. 3 at 149. Alvarado sold drugs to Matthew Owens, also a resident of Lyman, Wyoming. *Id.* at 342-43. Alvarado met Owens for the first time at Arnell's property in Wyoming and sold drugs to him at that meeting. *Id.* at 342-43, 345-46; R., Vol. 5 Ex. 103. Similarly, Alvarado met Landry for the first time at Arnell's property in Wyoming and sold drugs to him at that meeting. R., Vol. 3 at 345-46; R., Vol. 5 Ex. 103. Alvarado testified that he continued to do business with Owens and Landry for the next three years. R., Vol. 3 at 346.

Thus, even assuming that Acosta-Gallardo never set foot in the District of Wyoming, viewing the evidence in the light most favorable to the jury verdict, ample evidence was introduced showing that acts in furtherance of the conspiracy were committed there, making venue for Count One proper.

### *Count Eleven*

Venue for Count Eleven presents a trickier question. Count Eleven, quoted *supra*, charges Acosta-Gallardo with using a telephone to facilitate the methamphetamine distribution conspiracy alleged in Count One, in violation of Title 21, United States Code, Section 843(b). Acosta-Gallardo argues that venue was not proper in the District of Wyoming because the phone calls that took place on September 12, 2009 and which form the basis of Count 11, occurred entirely within the state of Utah and never touched the District of Wyoming. The government does not dispute this fact. However, the government argues that venue is nonetheless proper in the District of Wyoming because

the conspiracy facilitated by Acosta-Gallardo's phone call occurred in the District of Wyoming. The government argues that the Supreme Court's decision in *United States v. Rodriguez-Moreno*, 526 U.S. 275 (1999), supports this proposition. We agree.

This issue presents a question of first impression for our circuit. Section 843(b) provides that "[i]t shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a [drug] felony . . ." Because Section 843(b) does not contain an explicit venue provision, we must determine the place at which the crime was "committed" based on "the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Cryar*, 232 F.3d 1318, 1321 (10th Cir. 2000) (citing *Medina-Ramos*, 834 F.2d at 876).

Our precedent has not previously held that a Section 843(b) offense is "committed" in any jurisdiction where the underlying drug felony was committed. Our circuit has previously described venue for an 843(b) offense as being appropriate "in both the district where the call was made and in the district where it was received." *United States v. Goodwin*, No. 09-3316, 2011 WL 2006335, 5 (10th Cir. May 24, 2011) (citing *Andrews v. United States*, 817 F.2d 1277, 1279 (7th Cir. 1987); *United States v. Barnes*, 681 F.2d 717, 724 (11th Cir. 1982)) (unpublished). Because the phone calls at issue here were neither initiated nor received in Wyoming, we must determine whether the reasoning of *Rodriguez-Moreno* extends to Section 843(b) so that venue would have been proper there.

- 17 -

In *Rodriguez-Moreno*, the question before the Court was, where was venue proper for the offense of using or carrying a firearm "during and in relation to a crime of violence," in violation of 18 U.S.C. § 924(c)(1). 526 U.S. at 279. The defendant Rodriguez-Moreno had kidnaped his victim in Texas, transported him to New Jersey, New York, and then finally to Maryland, where the defendant came into possession of a firearm. *Id.* at 277. The Supreme Court held that venue for the firearms offense was proper in the District of New Jersey, even though the defendant did not "use or carry" the firearm until later, after he arrived in Maryland. *Id.*

To determine where the firearms offense was "committed," the Court began with the proposition that "the '*locus delicti* [of the charged offense] must be determined from the nature of the crime alleged and the location of the act or acts constituting it.'" *Id.* at 279 (quoting *United States v. Cabrales*, 524 U.S. 1, 6-7 (1998)) (alteration in *Rodriguez-Moreno*). For the Section 924(c)(1) offense, the Supreme Court identified two conduct elements constituting the offense: the "using and carrying" of a gun, and the commission of a kidnaping. *Id.* at 280-281. The Court held that because the Section 924(c)(1) offense "'consist[ed] of distinct parts which ha[d] different localities[,] the whole may be tried where any part can be proved to have been done.'" *Id.* at 281-82 (quoting *United States v. Lombardo*, 241 U.S. 73, 77 (1916)). The underlying kidnaping was a continuing offense, so it was "committed in all of the places that any part of it took place." *Id.* at 282. The Court in *Rodriguez-Moreno* therefore held that venue for the firearms offense was proper in all of those jurisdictions as well. *Id.*

The Court was also careful to distinguish its precedent in *Cabrales*, where it faced a similar question. In *Cabrales*, the defendant was charged with violating 18 U.S.C. §§ 1956 & 1957, which criminalize money laundering. 524 U.S. at 3. All of the actual money laundering transactions occurred in Florida, not in Missouri where the defendant was tried. *Id.* at 8; *Rodriguez-Moreno*, 526 U.S. at 280 n.4. Although the illegal activity that generated the eventually-laundered proceeds occurred in Missouri, the statutes at issue "did not proscribe the 'anterior criminal conduct that yielded the funds allegedly laundered.'" *Rodriguez-Moreno*, 526 U.S. at 280 n.4 (quoting *Cabrales*, 524 U.S. at 7). Thus, in *Cabrales*, venue was improper in Missouri. 524 U.S. at 8.

Our circuit has applied the reasoning of *Rodriguez-Moreno* to firearms offenses under Section 924, *e.g.*, *United States v. Brown*, 400 F.3d 1242, 1249-51 (10th Cir. 2005), and to other offenses as well. In *Cryar*, our circuit applied the reasoning of *Rodriguez-Moreno* to 18 U.S.C. § 2241(c) which criminalizes crossing a State line with intent to engage in a sexual act with a minor. 232 F.3d at 1321. Noting that Section 2241(c) did not contain a specific venue provision, our court identified three distinct elements that the government had to prove to determine the locus delicti of the crime: "the crossing of state lines, the intent to engage in the sexual act [with a child under twelve], and the attempt to do so." *Id.* at 1322. Finding that Section 2241(c) criminalizes a continuing offense, our court held that Congress permitted it to be prosecuted in any district where it was "'begun, continued, or completed.'" *Id.* (quoting 18 U.S.C. § 3237(a)). Thus, venue was proper in the Western District of Oklahoma, where the criminal conduct was

- 19 -

"completed," even though the defendant crossed state lines into the Eastern District of Oklahoma. *Id.*; *see also United States v. Byrne*, 171 F.3d 1231, 1235 n.2 (10th Cir. 1999) (holding that because "coercion and enticement" of a minor in violation of 18 U.S.C. § 2422 is a continuing offense, venue for the companion Section 843(b) offense was also proper in the District of New Mexico, where the minor was "enticed," even though the defendant did not initiate the call therefrom).

Notably, our circuit declined to extend the reasoning of *Rodriguez-Moreno*, to a prosecution under 18 U.S.C. § 1001(a)(2) for making a false statement "in any matter within the jurisdiction of the executive, legislative, or judicial branch" of the federal government. *United States v. Smith*, 641 F.3d 1200, 1207 (10th Cir. 2011). Finding that "making a false statement" was the only essential conduct element of a Section 1001(a)(2) offense, our court held that venue would have been proper only in Minnesota, where the false statement was made. *Id.* at 1207-08. Venue was not proper in the Western District of Oklahoma, where the defendant was tried, even though the underlying crime for which the defendant was being questioned took place in the Western District of Oklahoma. *Id.* at 1208-09.

With these principles in mind, we review the language of Section 843(b) to determine the essential conduct elements of the offense. For a Section 843(b) offense, the government must prove that the defendant (i) "knowingly or intentionally" (ii) used "any communication facility" (iii) in "committing or in causing or facilitating the commission of any act or acts constituting [a drug felony]." 21 U.S.C. § 843(b). Thus, there are <u>two</u>

conduct elements that the government must prove: first that the defendant used a communication facility, and second, that in doing so, the defendant committed, facilitated, or caused to be committed a drug felony.

That the commission of or facilitation of an underlying drug felony is a predicate offense to a Section 843(b) violation finds support in the Supreme Court's decision in *Abuelhawa v. United States*, 129 S. Ct. 2102 (2009). In *Abuelhawa*, the Court held that a defendant's misdemeanor drug purchase could not support a Section 843(b) offense, even though it made possible his drug supplier's felonious drug distribution. *Id.* at 2104. In analyzing the legislative history of Section 843(b), the Court reasoned that "Congress meant to treat purchasing drugs for personal use more leniently than the felony of distributing drugs, and to narrow the scope of the communications provision to cover only those who facilitate a *drug felony*." *Id.* at 2107 (emphasis added). Implicit in this analysis is the proposition that the defendant commits a felony for which he may be convicted.

Our case law similarly requires a defendant to be complicit in an underlying drug felony for a Section 843(b) conviction to stand. For example, in *United States v. Baggett*, our court held that simple possession of heroin, punishable only as a misdemeanor, could not support a Section 843(b) conviction. 890 F.2d 1095, 1097-98 (10th Cir. 1989); *accord Abuelhawa*, 129 S.Ct. at 2105 n.2. Later, however, in *United States v. Small*, our court noted that because possession of more than five grams of crack cocaine *is*

punishable as a felony, it could therefore support a Section 843(b) conviction. 423 F.3d 1164, 11 85-86 (10th Cir. 2005) (emphasis added).

In the instant case, the underlying drug felony is a conspiracy. We have previously held that inchoate crimes such as attempt and conspiracy qualify as drug felonies that may underlie a Section 843(b) offense. *United States v. Reed*, 1 F.3d 1105, 1108-09 (10th Cir. 1993) ("[W]e hold that proof of an underlying inchoate crime, such as attempt or conspiracy under § 846, is sufficient to sustain a facilitation conviction under § 843(b).") (quoting with approval *United States v. Pierorazio*, 578 F.2d 48, 51 (3d Cir. 1978)). Moreover, our circuit has characterized conspiracy as "the prototypical continuing offense." *United States v. Jaynes,* 75 F.3d 1493, 1505 (10th Cir. 1996) (citing *United States v. Massey*, 48 F.3d 1560, 1568 n.7 (10th Cir. 1995); and *United States v. McGoff*, 831 F.2d 1071, 1079 (D.C. Cir. 1987)).

Therefore, applying the reasoning of *Rodriguez-Moreno*, venue for prosecution of a Section 843(b) violation committed in furtherance of a conspiracy would be proper in any district where either the communication facility was used, or the underlying conspiracy was committed. In the instant case, because venue was proper in the District of Wyoming for the underlying drug felony (conspiracy to distribute methamphetamine), venue was proper there for the instant Section 843(b) offense.

Lack of Jury Venue Instructions

Acosta-Gallardo next argues that the district court's failure to instruct the jury on venue constituted structural error that is per se reversible.[3]  We note, however, that when a defendant has not requested a jury instruction on venue or has not objected to the lack of a specific venue instruction at trial, we review only for plain error.  *Kelly*, 535 F.3d at 1238 (citing *Byrne*, 171 F.3d at 1235).  In this case, Acosta-Gallardo does not suggest that he requested a jury instruction on venue, and we review for plain error.

Under plain error review, a defendant must show "'(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights.'" *Id.* at 1238-39 (quoting *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007)).  If the defendant satisfies these criteria, we "'may exercise discretion to correct the error if [4] it seriously affects the fairness, integrity, or public reputation of judicial proceedings.'"  *Id.* (same) (alteration in *Kelly*).  However, Acosta-Gallardo has not argued that there was plain error as to either Count One or Count Eleven and thus has not met his burden to demonstrate that the district court committed plain error by failing to instruct the jury on venue.

---

[3]  In support of this proposition, Acosta-Gallardo cites our court's decision in *United States v. Wiles*.  Aplt's Br. 14 (citing *Wiles*, 102 F.3d 1043, 1059-60 (10th Cir. 1996)).  Since our court's decision in *Wiles*, however, the Supreme Court has held that the failure to instruct the jury on an element of the offense does not constitute structural error that is reversible per se, but is instead subject to harmless error review.  *Neder v. United States*, 527 U.S. 1, 12-13 (1999).  Because neither party argues that harmless error review should apply to a district court's failure to instruct the jury on venue, we do not reach this question.

4. <u>Whether the evidence was sufficient to establish interdependence among Acosta-Gallardo, Alvarado, and Alvarado's Customers in Wyoming</u>

Acosta-Gallardo next challenges the sufficiency of the evidence related to the conspiracy charge presented at trial to sustain his conviction for Count One. We review sufficiency-of-the-evidence challenges de novo, "consider[ing] both direct and circumstantial evidence, and all reasonable inferences therefrom, in the light most favorable to the government." *United States v. Wardell*, 591 F.3d 1279, 1286-87 (10th Cir. 2009) (citing *United States v. Weidner*, 437 F.3d 1023, 1032 (10th Cir. 2006)). We may not disturb the jury's credibility determinations, nor weigh the evidence in performing this analysis. *Id.* at 1287 (citing *United States v. Waldroop*, 431 F.3d 736, 742 (10th Cir. 2005)). The evidence is sufficient under these tests if a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.* at 1286-87 (citing *United States v. Willis*, 476 F.3d 1121, 1124 (10th Cir. 2007)).

To prove a conspiracy, the government must show that "(1) two or more persons agreed to violate the law; (2) the defendant knew the essential objectives of the conspiracy; (3) the defendant knowingly and voluntarily participated in the conspiracy; and (4) the alleged coconspirators were interdependent." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006) (citing *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005)). The alleged co-conspirators must have "a shared, single criminal objective, not just have similar or parallel objectives between similarly situated people."

*Small*, 423 F.3d at 1182 (citing *United States v. Evans*, 970 F.2d 663, 671 (10th Cir. 1992))).

Acosta-Gallardo challenges only the interdependence fourth prong, arguing that he never spoke to or met co-defendant Robert Landry prior to trial. He also argues that his alleged co-conspirators— Kevin Watson, Charles Thunehorst, Brahnson Arnell, George Burkett, and Jason Freeman— were all cooperating witnesses for the government and that they testified that they purchased methamphetamine from either Landry or Alvarado, rather than from him. R., Vol. 3 at 451-58 [Watson testifying that he was purchasing drugs from Landry who was purchasing from a source unknown to him in Park City], R., Vol. 3 at 475-77 [Thunehorst testifying that he was buying drugs from Arnell, then from Alvarado starting in 2007]; R., Vol. 3 Tr. at 674 [Arnell testifying that his source was Alvarado], at 744-47 [Burkett testifying that he purchased methamphetamine from Landry], at 758 [Freeman testifiying that he got methamphetamine from Alvarado]. Additionally, Acosta-Gallardo points out that Watson, Thunehorst, Arnell, and Burkett testified that they never knew or heard of Acosta-Gallardo. Aplt's Br. 19 (citing R., Vol. 3 at 469 [Watson]; R., Vol. 3 Tr. at 658 [Thunehorst], 701 [Arnell], 776 [Freeman]).

These arguments, however, are unpersuasive because it is well-established that a conspirator need not know of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy. *See Evans*, 970 F.2d at 669-70. The evidence must show that a conspirator has at least a general awareness of both the scope and the objectives of the conspiracy. *Id.* Viewed in the light most favorable to the

government, Alvarado-Gallardo was aware of the scope and objectives of the conspiracy. He supplied an estimated ten pounds of methamphetamine to Alvarado and Alvarado testified that he would generally purchase the drugs by the pound. *See United States v. Caro,* 965 F.2d 1548, 1556 (10th Cir. 1992) (holding that a defendant's delivery of large quantities of drugs provides circumstantial evidence that he was not merely a customer of the conspiracy); *United States v. Powell,* 982 F.2d 1422, 1430 (10th Cir. 1992) ("[T]he intent to distribute a controlled substance may be inferred from the possession of a large quantity of the substance."). Evidenced by the September 16, 2009 phone call, Alvarado also provided feedback on the quality of the drugs provided by Acosta-Gallardo. Alvarado returned to Acosta-Gallardo as a reliable supplier who could meet his volume demands and provide a better quality of drugs than Juvenal Garcia.

Moreover, interdependence may be shown if a defendant's activities "facilitated the endeavors of other alleged co-conspirators or facilitated the venture as a whole." *United States v. Heckard*, 238 F.3d 1222, 1230 (10th Cir. 2001) (citing *United States v. Ivy*, 83 F.3d 1266, 1286 (10th Cir. 1993)). "Co-conspirators are interdependent when they 'inten[d] to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged.'" *United States v. Fishman*, --- F.3d ----, 2011 WL 2084207, *9 (10th Cir. 2011) (quoting *Evans*, 970 F.2d at 671) (emphasis and alteration in *Fishman*). As the government argues, the evidence here is sufficient to support finding of a chain-and-link conspiracy where the overall objective was to possess and to distribute methamphetamine for profit. *See United States v. Dickey*, 736 F.2d 571, 582 (10th Cir.

1984).  Acosta-Gallardo's distributing drugs to Alvarado facilitated Alvarado's further distribution of drugs.  In turn, some of Alvarado's customers further distributed the drugs to their own customers.  Acosta-Gallardo's advancing drugs to Alvarado on credit facilitated Alvarado's ability to sell the drugs because he did not need to pay for them up front.  Acosta-Gallardo could not profit unless Alvarado could successfully sell the drugs and pay Acosta-Gallardo back for the drugs advanced.  Thus, there was ample evidence that Acosta-Gallardo's actions facilitated the venture as a whole.

Acosta-Gallardo's argument that he and co-defendant Landry were not interdependent because they were involved in two separate conspiracies similarly fails. Acosta-Gallardo argues that Alvarado was involved in one conspiracy involving the purchase of drugs from three suppliers (of whom he was one), and in another conspiracy involving the distribution of drugs into the District of Wyoming.  Whether sufficient evidence was presented to establish a single conspiracy is a question of fact for the jury to decide.  *Dickey*, 736 F.2d at 581 (citing *United States v. Watson*, 594 F.2d 1330, 1340 (10th Cir. 1979)).  "When reviewing the jury's decision, we view the evidence, both direct and circumstantial, in the light most favorable to the government, and all reasonable inferences and credibility choices must be made in support of the jury's verdict."  *Id.* at 581-82 (citing *United States v. Pilling*, 721 F.2d 286, 288-89 (10th Cir. 1983)).  To make a finding of a single conspiracy, the jury must be convinced beyond a reasonable doubt that the alleged coconspirators possessed a common, illicit goal.  *Id.* at 582 (citing *United States v. Brewer*, 630 F.2d 795, 799 (10th Cir. 1980)).  "To satisfy this

- 27 -

'common objective' test . . ., the essential element of interdependence must be met. . ." *Id.* (citing *United States v. Peterson*, 611 F.2d 1313, 1326-27 (10th Cir. 1979)).

The government presented ample evidence of interdependence among Acosta-Gallardo, Alvarado, and their co-defendants. Acosta-Gallardo's ability to profit from his sales of drugs to Alvarado depended on Alvarado's ability to successfully sell the drugs to his customers, many of whom were in Wyoming. Drawing reasonable inferences in favor of the jury's verdict, ample evidence existed to support the jury's finding that Acosta-Gallardo and Landry were involved in a single conspiracy. Thus, Acosta-Gallardo's sufficiency-of-the-evidence challenge fails.

Accordingly, we AFFIRM Acosta-Gallardo's conviction.