**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 12, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

STEPHEN BLACKBURN,

    Defendant-Appellant.

No. 11-3294

(D.C. No. 2:09-CR-20133-JWL-12)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **LUCERO**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.
_____

A jury convicted Defendant Stephen Blackburn of one count of conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(vii). Defendant now appeals, challenging venue and the sufficiency of the evidence. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I.

The Government presented the following facts at trial. The conspiracy in this case had its roots in 1997 when Curtis Pitter (also known as Michael Francois) got in contact with his boyhood friend Devon Thomas. Pitter would arrange for a source in Los

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Angeles, California, to ship five to ten pounds of marijuana to Thomas in Florida. This arrangement was interrupted in 1998 and again in 2000 by Thomas and then Pitter serving time in jail and Thomas twice being deported to Jamaica. Pitter and Thomas resumed marijuana trafficking in earnest in 2004, this time with Thomas going to Phoenix, Arizona, to obtain marijuana from Mexican sources. Thomas would pay the sources with cash sent from Pitter and delivered by either Tamary Brown or Gladstone McDowell. Pitter would then wrap the marijuana in plastic wrap, put grease over the packages, box them (usually with an outer and inner box sealed by spray foam or glue), and ship the boxes to Kansas City, Missouri, by UPS. The shipments started out at thirty to forty pounds per week and increased to around 300 pounds per week. Dwight Rhone, Pitter's cousin, also helped ship the marijuana. The conspirators split the profits based on set percentages, with Pitter receiving 40%, Gladstone McDowell 30%, Thomas 20%, and Rhone 10%.

In 2006, police arrested Devon Thomas in Phoenix while he was dropping off marijuana packages at a UPS store. After being released on bail, he fled to Florida, where he continued to receive money from Pitter for his part of the marijuana profits. Thomas testified that five men "work[ed] for us" in Phoenix packaging marijuana. Record on Appeal ("ROA"), vol. VII at 303. These men were Rhone, Theodore McDowell (Gladstone McDowell's son), Samora McIntosh, Sheldon McIntosh, and Ibrahima Kane. They became known at trial as the "Arizona Five." Thomas testified that Arizona Five had money invested in the marijuana business and each would receive a certain percentage of the profits based on his contribution. He also testified that most of

the people working in Phoenix were connected through Pitter, "but, I mean, it was just one organization. One come [sic] and goes. I wasn't directly involved with most of these people, but there was a part of it through [Pitter]." ROA, vol. VII at 306–07. The conspirators' usual pattern of travel was to drive or take a bus from Kansas City to Phoenix, and then to fly on one-way tickets back to Kansas City. They would also often fly through Las Vegas, Nevada, in order to attract less suspicion if they were discovered with large amounts of cash.

In May 2007, the organization suffered a setback when Pitter and the Arizona Five were arrested at a house in Avondale, Arizona, a suburb of Phoenix. The police seized 630 pounds of marijuana and $223,000 in cash from the house. Defendant Blackburn immediately flew to Arizona, where he attempted to get the men released on bail. Only Pitter was released, and after taking a break for a month or two, the organization resumed trafficking marijuana. Pitter sent Gladstone McDowell to Arizona to purchase and package marijuana. But sometime in the summer of 2007, Pitter asked Thomas to return to Arizona because Gladstone was not negotiating for a proper quality of marijuana. Thomas said the organization was shipping between 200 and 300 pounds of marijuana twice a month during the second half of 2007.

Thomas testified that Pitter asked him to send some marijuana to a person in Tennessee named Yosiphat. Thomas believed this person was Defendant Blackburn, but Tamary Brown identified "Yosiphat" as Denaud Egana. Egana himself said his name was "Yehosaphat." Egana testified that Defendant recruited him in 2007 to do legal research regarding the Arizona Five because Egana was a paralegal. Defendant and

Egana received powers of attorney in the names of each of the Arizona Five. Defendant used these powers of attorney to inform Arizona law enforcement officials that approximately $70,000 was missing from the Avondale house in addition to the $223,000 seized by police.

Egana also testified that in early 2007 Defendant had offered Egana some marijuana for resale. Defendant told Egana that he received marijuana packages from Pitter and Pitter's "congregation" and that Defendant "survived" through the distribution of marijuana. Egana declined the offer to distribute marijuana because he wanted to stay out of trouble. In 2008, Egana helped Defendant draft a motion in defense of a young man in Defendant's congregation who was facing marijuana-related charges in Tennessee. Defendant told Egana he had lost $10,000 of his own money in relation to the case. Defendant also told Egana that if Pitter had shipped the marijuana to him, the police would not have intercepted it in Tennessee.

Defendant's IRS records showed that he did not file federal income tax returns in 2007, even though his bank account showed cash deposits of $42,698. The account records also showed multiple withdrawals for rental vehicles and airline tickets. Egana testified that Pitter had purchased a car for Defendant for $40,000.

In November 2007, a local narcotics enforcement officer stopped a SUV bearing Missouri license plates in Goodwell, Oklahoma, after he observed it driving westbound on the shoulder of Highway 54 without signaling. While the car was stopped, another officer arrived with a drug dog, which alerted to the vehicle. A search yielded $139,980 in cash. Gladstone McDowell was a backseat passenger in the vehicle. He claimed the

money, signing a receipt for it and writing "The money is mine alone." An assistant district attorney from Guymon, Oklahoma, testified that he filed a forfeiture action against the currency. He mentioned that Guymon was in the Oklahoma panhandle. He testified that five days after the seizure, Defendant came to the district attorney's office in Guymon and said the "moneys were church moneys" and asked that the money be given back to him. ROA, vol. VII at 1152. The district attorney's office declined.

In June 2009, a UPS store owner in Mesa, Arizona, notified the DEA that a person matching the description of Curtis Pitter had dropped off sixteen boxes. The boxes were addressed to two addresses in Missouri, one of which was associated with a former housemate of Pitter's. The DEA obtained a search warrant for the eight boxes being sent to that address, and tracked the boxes to a UPS distribution facility in Kansas City, Kansas. A search of those boxes yielded about 200 pounds of marijuana.

The marijuana trafficking organization finally unraveled in December 2009, when agents arrested Curtis Pitter and Gladstone McDowell and searched both their residences in Kansas City, Missouri. At Gladstone McDowell's residence, the agents seized records documenting marijuana transactions totaling 4,545.5 pounds. At Pitter's residence on Oldham Road, authorities found 67 pounds of marijuana, $98,256 in cash, and an envelope containing power of attorney documents for the five defendants held in Arizona. The Oldham Road residence had been purchased under Gladstone McDowell's name in 2005, although Pitter provided the money for the mortgage payments. Closing for the house took place at a title company's office in Leawood, Kansas. The down payment was made up of cashier's checks, several of which were obtained in Jamaica.

A grand jury indicted Defendant and nineteen other persons on drug trafficking and money laundering charges. The Superseding Indictment charged Defendant with conspiring to distribute 1000 kilograms or more of marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(vii). A jury convicted Defendant, and the district court sentenced him to 151 months' imprisonment. Defendant filed no fewer than nine post-trial motions *pro se*, raising (among other things) the issues he now urges on appeal with benefit of counsel—insufficient evidence and improper venue.

II.

"We review sufficiency-of-the-evidence challenges de novo, considering both direct and circumstantial evidence, and all reasonable inferences therefrom, in the light most favorable to the government." United States v. Acosta-Gallardo, 656 F.3d 1109, 1123 (10th Cir. 2011) (internal quotation marks and brackets omitted). We will reverse on sufficiency of the evidence grounds only if "no rational jury could have found each element of the crime beyond a reasonable doubt." United States v. Parada, 577 F.3d 1275, 1283 (10th Cir. 2009). To prove a defendant was part of a drug-trafficking conspiracy under 18 U.S.C. § 841, the Government must show: "(1) two or more persons agreed to violate the law; (2) the defendant knew the essential objectives of the conspiracy; (3) the defendant knowingly and voluntarily participated in the conspiracy; and (4) the alleged coconspirators were interdependent." United States v. Yehling, 456 F.3d 1236, 1240 (10th Cir. 2006).

Here, the jury heard the following evidence linking Defendant to the marijuana trafficking conspiracy. In early 2007, he offered to Egana some marijuana to sell. He

told Egana he received marijuana from Pitter's "congregation" and that he survived by distributing marijuana. Defendant told Egana he had lost $10,000 of his own money when a member of Defendant's "congregation" was found in possession of marijuana, and he told Egana that the marijuana would not have been caught if Pitter had shipped it to Defendant. Defendant flew from Tennessee to Phoenix the day after the Arizona Five were arrested and tried to help them with their legal proceedings. He tried to claim the $139,980 in cash seized from Gladstone McDowell in the Oklahoma panhandle, claiming it was "church money." And, finally, Pitter purchased a $40,000 car for Defendant. From this evidence, a rational jury could easily conclude Defendant was a member of the conspiracy.

Defendant makes several feeble attempts to undermine this evidence. First, he says he "made no claim to the money" seized in Oklahoma. Appellant's Br. at 21. Likewise, he asserts in the fact section of his brief, "Further evidence presented at trial confirmed that Stephen Blackburn never made a claim for the money seized in Oklahoma." Id. at 7. This flatly misstates the evidence. The part of the record Defendant cites only establishes that he didn't file any "legal documents stating that the money was his." ROA, vol. VII at 1873. But the assistant district attorney from Guymon, Oklahoma, testified, "Later Mr. Blackburn then came to our office. He said that those moneys were church moneys, and he asked if we would give those church moneys back to him." Id. at 1152. So Defendant did, in fact, make a claim to the money.

Next, Defendant claims Devon Thomas was a wholly unreliable witness based on his mistaken belief that Defendant used the name Yosiphat or Yehosaphat, even though

- 7 -

two other witnesses identified Egana as Yosiphat. Defendant also says Thomas initially told federal agents that he shipped eight pounds of marijuana to Yosiphat, but then testified at trial that he sent Yosiphat 300 to 400 pounds. But these attempts to undermine Thomas's credibility are futile on appeal. Weighing credibility is a job delegated to the jury, not to us. United States v. Bowen, 527 F.3d 1065, 1076 (10th Cir. 2008).

Finally, Defendant tries to cast doubt on Egana's testimony that Defendant offered to front him marijuana. Defendant says, in a footnote, that Egana's testimony was "uncorroborated, came from a person admitted to have a history of convictions for truth or veracity crimes and [who] was hoping for consideration for a reduction of his sentence." Apellant's Br. at 22 n.5. He adds that even if this testimony were true, it would be evidence of "a whole separate conspiracy" from the conspiracy charged in the indictment. Id. In our circuit, "[a]rguments raised in a perfunctory manner, such as in a footnote, are waived." United States v. Hardman, 297 F.3d 1116, 1131 (10th Cir. 2002). Yet even if we treated these arguments as properly raised, the first argument goes only to Egana's credibility, which is unreviewable on appeal. Bowen, 527 F.3d at 1076. The second argument would be subject to plain error review because Defendant did not raise it in any of his post-trial motions. See Fed. R. Crim. P. 52(b). And the evidence connecting Defendant to the larger conspiracy demonstrates there was no error, much less a plain one. So we cannot overturn the jury's verdict.

## III.

Article III of the Constitution requires the trial of all crimes to be held "in the State

where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. See also U.S. Const. amend. VI. Echoing the constitutional command, Federal Rule of Criminal Procedure 18 directs that venue is proper "in a district where the offense was committed." When the crime charged is conspiracy, "venue as to prosecution of all members of the conspiracy lies either in the jurisdiction in which the conspiratorial agreement was formed or in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators." United States v. Foy, 641 F.3d 455, 466 (10th Cir. 2011) (quoting United States v. Rinke, 778 F.2d 581, 584 (10th Cir. 1985)). The Government need only prove venue by a preponderance of the evidence. Acosta-Gallardo, 656 F.3d at 1118.

In this case, the properly-instructed jury found venue to lie in the United States District Court for the District of Kansas. Defendant has not challenged the jury instructions, but only the adequacy of the evidence supporting venue. In reviewing a jury's decision that venue lies in a particular district, we "view the evidence in the light most favorable to the government and make all reasonable inferences and credibility choices in favor of the finder of fact." Id. (brackets omitted) (quoting United States v. Kelly, 535 F.3d 1229, 1232 (10th Cir. 2008)).

The Government proposes several bases on which the jury could have rested its venue finding. First, the Government argues the jury reasonably could have found venue to lie in Kansas based on the seizure of eight boxes of marijuana in the UPS facility in

Kansas City, Kansas.[1] But although the conspirators certainly shipped the boxes through Kansas, the mere presence of the boxes in Kansas is hardly an "overt act." Pitter committed an overt act in furtherance of the conspiracy when he shipped the packages from a UPS store in Mesa, Arizona. But UPS's transportation of the boxes through Kansas, even if foreseeable, was not an act committed by any of the conspirators. If this were a sufficient basis for venue, the Government could have brought the prosecution in any judicial district through which the conspiracy's marijuana shipments passed. For this specific shipment, those districts might have included the District of New Mexico, the Western and Northern Districts of Oklahoma, and the Northern District of Texas. The boxes may have even traveled through a UPS hub in another district, such as the District of Colorado. The record also shows the conspirators shipped marijuana from Arizona to Florida and Tennessee. So under the Government's theory, venue might lie in any number of judicial districts in the southern United States simply because UPS shipments traveled through those districts. The Government has not cited, nor have we found, any authority for stretching the rules of venue so far.

The Government also argues the closing of the Oldham Road residence sale at a title company in Kansas is sufficient to establish venue. The Oldham Road purchase was relevant to the money laundering charges, but Defendant was only convicted for conspiracy to possess marijuana with intent to distribute. Nothing in the record suggests

---

[1] Defendant suggests UPS actually found these boxes in Missouri, but then transported them to a secured facility in Kansas. This supposition is directly contradicted by the record, which shows the boxes were "seized at the UPS hub in Kansas City, Kansas." ROA, vol. VII at 1115.

that the purchase of the Oldham Road residence was an act in furtherance of the marijuana-trafficking conspiracy.

Ultimately, we need not decide whether these first two theories are sufficient to support the jury's finding of venue. The jury heard other evidence from which it could conclude by a preponderance of the evidence that the conspirators committed acts in furtherance of the conspiracy in the District of Kansas. Tamary Brown testified that she, Gladstone McDowell, and Marlon Forrester would drive or take a bus from Kansas City, Missouri, to Arizona with the money to buy more marijuana. Furthermore, the jury heard that police stopped a vehicle carrying Gladstone McDowell and nearly $140,000 in cash on Highway 54 in the Oklahoma panhandle. The vehicle bore Missouri license plates and was westbound. Jurors could easily conclude based on these pieces of evidence that multiple members of the conspiracy drove through Kansas in order to return cash to Arizona. Driving a vehicle and carrying cash are both overt acts. See United States v. Record, 873 F.2d 1363, 1370 (10th Cir. 1989) (approving jury instruction that said an overt act for venue purposes "may be as innocent as the act of a man walking across the street, or driving an automobile, or using a telephone"). See also United States v. Bailon-Santana, 429 F.3d 1258, 1262 (9th Cir. 2005) (driving a car); United States v. Fernandez, 559 F.3d 303, 327 (5th Cir. 2009) (loading cash into a truck). So the jury reasonably could infer the conspirators committed overt acts in furtherance of the conspiracy in the District of Kansas. Consequently, we cannot disturb its finding that venue was proper in that district.

AFFIRMED.

Entered for the Court,


Bobby R. Baldock
United States Circuit Judge