[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
1/20/99
THOMAS K. KAHN
CLERK

No. 98-2486
Non-Argument Calendar

D. C. Docket No. 96-92-CR-J-20

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALEXANDER PENA-COREA,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Florida

(January 20, 1999)

Before TJOFLAT, ANDERSON and MARCUS, Circuit Judges.

PER CURIAM:

Following a jury trial, Alexander Pena-Corea ("Pena") was convicted in the district court of illegal re-entry into the United States as a previously deported alien, in violation of 8 U.S.C. § 1326 (1994). He appeals, contending alternatively (1) that his conviction should be vacated and the indictment dismissed because he was tried after the 180-day deadline contained in the Interstate Agreement on Detainers Act ("IADA"), 18 U.S.C. App. 2, Art. III (1994), had expired, and (2) that he should be granted a new trial because the district court erred in permitting the Government to introduce in its case-in-chief statements he made at a hearing on his motion to dismiss the indictment on statute of limitations grounds (namely, that he had re-entered, and had been "found in," the United States more than five years before the indictment was returned). We affirm.

I.

In 1986, Pena was convicted in the United States District Court for the Northern District of California of using a telephone to facilitate a conspiracy to import cocaine. The court sentenced Pena to two years in prison, suspended the sentence, and placed Pena on probation for five years, with a special condition that he leave the United States immediately and not return without the Attorney General's permission. Pena agreed to this condition and was deported to Colombia on February 6, 1987.[1] Pena thereafter illegally re-entered the United States, and was arrested for various offenses – in 1988, in 1989, and in 1991. On each occasion, he claimed to

_____

[1] Pena traveled to Colombia on a provisional passport issued by the Republic of Colombia in response to an Immigration and Naturalization Service ("INS") inquiry concerning Pena's Colombian citizenship.

have been born in Puerto Rico, provided the authorities with a false name, false identification, and a false social security card, and, after being convicted, was sentenced to a term of probation.

In March 1995, Pena was arrested in Hillsborough County, Florida, after delivering two kilograms of cocaine to an undercover police officer. At that time, he falsely identified himself as Alexander Correa-Pena. Pena was convicted of that offense under this false name, and sentenced to ten years in the Florida prison system. In June 1996, in an attempt to avoid serving the full ten-year term, Pena had his attorney write the INS with the request that it deport him immediately. Counsel's letter identified Pena incorrectly as Alexander Correa-Pena and failed to mention that he had been previously deported. Meanwhile, the Florida prison authorities, having determined that Pena had been born outside the United States, informed the INS of such fact. In early July 1996, the INS identified Correa-Pena as Pena-Corea, the appellant, and on July 24 a federal grand jury returned the instant indictment charging him with illegal re-entry.

Rather than seek Pena's immediate appearance for trial, the United States Attorney decided to lodge a detainer with the person in charge of Pena's incarceration, and he instructed the United States Marshal deliver the detainer to that person. The Marshal did so, faxing the detainer to the prison of Pena's incarceration (and simultaneously sending a hard copy of the detainer to the Florida Department of Corrections). The prison authorities, however, failed to serve Pena with the detainer and to advise him of his right to demand that he be brought to trial immediately. As a consequence, Pena, who knew that he had been indicted, did not exercise that right.

In July 1997, Pena's attorney requested that the Government proceed with its prosecution of Pena. On August 26, 1997, Pena was arraigned, and on September 8, 1997, he moved the

3

district court to dismiss his indictment on the grounds that the prosecution was barred by the five-year statute of limitations, 18 U.S.C. § 3282 (1994), and that he had not been brought to trial within the 180-day period prescribed by the IADA. On November 20, the court held an evidentiary hearing on the motions. Pena testified in support of his statute of limitations defense – that he had been "found in" the United States, within the meaning of 8 U.S.C. § 1326,[2] more than five years prior to the return of the indictment. At the conclusion of the hearing, the district court rejected Pena's statute of limitations defense. As for Pena's IADA claim, the court ruled that the IADA had not been implicated because Pena had never been served with the detainer.[3]

II.

18 U.S.C. § 3161(j) (1994) provides:

> (1) If the attorney for the Government knows that a person charged with an offense is serving a term of imprisonment in any penal institution, he shall promptly –
>> (A) undertake to obtain the presence of the prisoner for trial; or
>> (B) cause a detainer to be filed with the person having custody of the prisoner and request him to advise the prisoner of his right to demand trial.

---

[2] 8 U.S.C. § 1326 (West Supp. 1998) states, in pertinent part:
[A]ny alien who –
(1) has been . . . deported . . . and thereafter
(2) enters . . . or is at any time found in, the Unites States, unless . . .
shall be fined under Title 18, or imprisoned not more than 2 years, or both.

[3] Pena's conduct in hiding his true identity from state officials may have contributed to the Florida prison authority's failure to serve Pena. As the district court observed, Pena had been convicted and incarcerated under the name "Alexander Correa-Pena," while the detainer had issued in the name of "Alexander Pena-Corea."

4

(2) If the person having custody of such prisoner receives a detainer, he shall promptly advise the prisoner of the charge and of the prisoner's right to demand trial.  If at any time thereafter the prisoner informs the person having custody that he does demand trial, such person shall cause notice to that effect to be sent promptly to the attorney for the Government who caused the detainer to be filed.
(3) Upon receipt of such notice, the attorney for the Government shall promptly seek to obtain the presence of the prisoner for trial.

In sum, section 3161(j) gives the prosecutor two choices.  He may pursue an immediate trial or he may let the defendant call the shot – that is, the defendant may demand an immediate trial or he may simply bide his time and hope for the best.  In the instant case, the prosecutor chose the latter course.  In doing so, he followed the statutory command to the letter: he lodged a detainer with the person having Pena's custody with the request that such person advise Pena of his right to demand a trial.  Had such person served Pena with the detainer, Pena could have triggered the running of IADA's 180-day speedy-trial provision.  That provision, contained in Article III of the statute, states:

> (a) Whenever a person has entered upon a term of imprisonment in a penal . . . institution of [a State that is a party to the Agreement on Detainers], and whenever during the continuance of the term of imprisonment there is pending in any other party State any untried indictment . . . on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment . . . .

18 U.S.C. App. 2, Art. III (1994).

The question here is whether the Government should be held responsible for the state custodian's failure to serve Pena with the federal detainer and to advise him of his right to

5

demand a trial.  We think not.  In reaching this conclusion, we follow the lead of the Fifth Circuit in Lara v. Johnson, 141 F.3d 239, 243 (5ᵗʰ Cir. 1998), which held that "dismissal because of negligence on the part of the sending state is not a part of the IAD[A], and . . . it would be inappropriate to expand the list of situations in which dismissal is dictated."  The IADA provides for dismissal in the following situations:

> (1) if, after a prisoner has made the required request pursuant to Article III, trial does not occur within the required 180 days;
> (2) when trial does not occur before the prisoner, having been transferred to the receiving state, is sent back to the sending state; or
> (3) when the receiving state fails or refuses to accept temporary custody of the prisoner.

Id. (citation omitted).

III.

Assuming that his IADA claim fails, Pena contends alternatively that he is entitled to a new trial because the district court committed reversible error as a matter of law when it permitted the Government to introduce into evidence statements he made at the hearing on his motion to dismiss the indictment.  As authority for his argument, Pena cites Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), which held that "when a Defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection."  Id. at 394, 88 S. Ct. at 976.  We need not reach the question of whether Simmons' rationale extends to a situation like the one here – where the defendant was not attempting to vindicate a constitutional right – because the evidence of Pena's guilt was

6

overwhelming.  Thus, the error, if any, was harmless.

AFFIRMED.