FILED
United States Court of Appeals
Tenth Circuit

April 12, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

SAMORA McINTOSH,

    Defendant-Appellant.

No. 11-3333

(D.C. No. 2:09-CR-20133-JWL-10)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **LUCERO**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.
_____

A jury convicted Defendant Samora McIntosh of one count of conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(vii). He now appeals from his conviction and sentence on five separate grounds. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We affirm.

I.

The facts relating to the larger marijuana trafficking conspiracy involved in this case are set forth more fully in United States v. Stephen Blackburn, --- F. App'x ---, No. 11-3294 (10th Cir. 2013) (unpublished). Defendant's active role in the conspiracy ended

_____

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

on May 2, 2007, when police executed a search warrant on a house in Avondale, Arizona. Police arrested Defendant along with four other men: Sheldon McIntosh (Defendant's brother), Theodore McDowell, Dwight Rhone, and Ibrahima Kane. Officers had arrested the conspiracy's ringleader, Curtis Pitter, a few hours earlier when he left the house in a van carrying saran-wrap style packaging with small amounts of marijuana stuck to it. A vehicle in the house's garage contained approximately 630 pounds of marijuana in thirty boxes. The marijuana was wrapped in plastic and grease, then placed in cardboard boxes in which the conspirators had glued a thin wood lining. Defendant had glue on his shorts and his right hand. Inside the house, police found drug packing materials and $223,000 in cash hidden in a suitcase and a spare tire.

After Defendant's arrest, an Arizona jury convicted him on state drug charges. Later, a federal grand jury in the United States District Court for the District of Kansas indicted him and nineteen other people on various drug-trafficking and money laundering charges. Specifically, the superseding indictment charged Defendant with conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana. At trial, the jury heard evidence linking Defendant and the Avondale house with a larger drug trafficking conspiracy headed by Curtis Pitter. The evidence showed that the conspirators would regularly drive or ride the bus from Kansas City, Missouri, to Phoenix, Arizona, carrying cash. They would then purchase marijuana, package it so as to reduce the smell, and ship it by UPS ground to Kansas City and sometimes other destinations. They would then fly back to Kansas City. Devon Thomas, a member of the conspiracy, testified the conspirators would frequently fly through Las Vegas because

"it's easier to take large quantities of money through Las Vegas because of gambling." Record on Appeal ("ROA"), vol. II at 1437–38.

The jury heard that in November 2007 narcotics officers seized $139,980 in cash from one conspirator, Gladstone McDowell, who was traveling westbound on Highway 54 in the Oklahoma panhandle. It also heard that the ringleader, Pitter, mailed sixteen boxes of marijuana in June 2009 from a UPS store in Mesa, Arizona. Federal agents seized eight of these boxes, containing 200 pounds of marijuana, at a UPS distribution facility in Kansas City, Kansas. Finally, the jury heard that Gladstone McDowell purchased a residence on Oldham Road in Kansas City, Missouri, in 2005 with cashier's checks that had been sent from Jamaica. Closing for the purchase took place in Leawood, Kansas. The jury convicted Defendant of the charged conspiracy. The district court then sentenced him to 67 months' imprisonment after reducing his sentence from 121 months to reflect the 54 months he had served in Arizona based on the same conduct. See U.S.S.G. § 5G1.3(b)(1).

On appeal, Defendant makes the following arguments: (1) the Government failed to prove venue was proper in the United States District Court for the District of Kansas, (2) the evidence was insufficient to support his conviction on the conspiracy charge, (3) the facts proven at trial varied from the indictment, (4) the district court at sentencing erroneously calculated the drug quantity attributable to Defendant, and (5) the Government violated the Interstate Agreement on Detainers.

## II.

We turn first to Defendant's venue argument, which he preserved below in a

motion for judgment of acquittal. Article III of the Constitution requires the trial of all crimes to be held "in the State where the said Crimes shall have been committed." U.S. Const. art. III, § 2, cl. 3. See also U.S. Const. amend. VI. Echoing the constitutional command, Federal Rule of Criminal Procedure 18 directs that venue is proper "in a district where the offense was committed." When the crime charged is conspiracy, "venue as to prosecution of all members of the conspiracy lies either in the jurisdiction in which the conspiratorial agreement was formed or in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators." United States v. Foy, 641 F.3d 455, 466 (10th Cir. 2011) (quoting United States v. Rinke, 778 F.2d 581, 584 (10th Cir. 1985)). The Government need only prove venue by a preponderance of the evidence. United States v. Acosta-Gallardo, 656 F.3d 1109, 1118 (10th Cir. 2011).

In this case, the properly-instructed jury found venue to lie in the United States District Court for the District of Kansas. Defendant has not challenged the jury instructions, but only the adequacy of the evidence supporting venue. In reviewing a jury's decision that venue lies in a particular district, we "view the evidence in the light most favorable to the government and make all reasonable inferences and credibility choices in favor of the finder of fact." Id. (brackets omitted) (quoting United States v. Kelly, 535 F.3d 1229, 1232 (10th Cir. 2008)).

The Government proposes several bases on which the jury could have rested its venue finding. First, the Government argues the jury reasonably could have found venue to lie in Kansas based on the seizure of eight boxes of marijuana in the UPS facility in

- 4 -

Kansas City, Kansas. But although the conspirators certainly shipped the boxes through Kansas, the mere presence of the boxes in Kansas is hardly an "overt act." Pitter committed an overt act in furtherance of the conspiracy when he shipped the packages from the UPS store in Mesa, Arizona. But UPS's transportation of the boxes through Kansas, even if foreseeable, was not an act committed by any of the conspirators. If this were a sufficient basis for venue, the Government could have brought the prosecution in any judicial district through which marijuana shipments passed. For this specific shipment, those districts might have included the District of New Mexico, the Western and Northern Districts of Oklahoma, and the Northern District of Texas. The boxes may have even traveled through a UPS hub in another district, such as the District of Colorado. The record also shows the conspirators shipped marijuana from Arizona to Florida and Tennessee. So under the Government's theory, venue might lie in any number of judicial districts in the southern United States simply because UPS shipments traveled through those districts. The Government has not cited, nor have we found, any authority for stretching the rules of venue so far.

The Government also argues the closing of the Oldham Road residence sale at a title company in Kansas is sufficient to establish venue. The Oldham Road purchase was relevant to the money laundering charges, but Defendant was only convicted for conspiracy to possess marijuana with intent to distribute. Nothing in the record suggests that the purchase of the Oldham Road residence was an act in furtherance of the marijuana-trafficking conspiracy.

Ultimately, we need not decide whether these first two theories are sufficient to

- 5 -

support the jury's finding of venue. The jury heard other evidence from which it could conclude by a preponderance of the evidence that the conspirators committed acts in furtherance of the conspiracy in the District of Kansas. Tamary Brown testified that she, Gladstone McDowell, and Marlon Forrester would drive or take a bus from Kansas City, Missouri, to Arizona with the money to buy more marijuana. Furthermore, the jury heard that police stopped a vehicle carrying Gladstone McDowell and nearly $140,000 in cash on Highway 54 in the Oklahoma panhandle. The vehicle bore Missouri license plates and was westbound. Jurors could easily conclude based on these pieces of evidence that multiple members of the conspiracy drove through Kansas in order to return cash to Arizona. Driving a vehicle and carrying cash are both overt acts. See United States v. Record, 873 F.2d 1363, 1370 (10th Cir. 1989) (approving jury instruction that said an overt act for venue purposes "may be as innocent as the act of a man walking across the street, or driving an automobile, or using a telephone"). See also United States v. Bailon-Santana, 429 F.3d 1258, 1262 (9th Cir. 2005) (driving a car); United States v. Fernandez, 559 F.3d 303, 327 (5th Cir. 2009) (loading cash into a truck). So the jury reasonably could infer the conspirators committed overt acts in furtherance of the conspiracy in the District of Kansas. Consequently, we cannot disturb its finding that venue was proper in that district.[1]

---

[1] Defendant also asserts there was inadequate proof of his connection to the conspiracy to establish venue in the District of Kansas. We will address this claim under his sufficiency of the evidence argument.

III.

Defendant's second argument is that the evidence was insufficient to support his conviction. "We review sufficiency-of-the-evidence challenges de novo, considering both direct and circumstantial evidence, and all reasonable inferences therefrom, in the light most favorable to the government." Acosta-Gallardo, 656 F.3d at 1123 (internal quotation marks and brackets omitted). We will reverse on sufficiency of the evidence grounds only if "no rational jury could have found each element of the crime beyond a reasonable doubt." United States v. Parada, 577 F.3d 1275, 1283 (10th Cir. 2009). To prove a defendant was part of a drug-trafficking conspiracy under 18 U.S.C. § 841, the Government must show: "(1) two or more persons agreed to violate the law; (2) the defendant knew the essential objectives of the conspiracy; (3) the defendant knowingly and voluntarily participated in the conspiracy; and (4) the alleged coconspirators were interdependent." United States v. Yehling, 456 F.3d 1236, 1240 (10th Cir. 2006).

Here, the jury heard the following evidence linking Defendant to the marijuana trafficking conspiracy. Police arrested Defendant in the Avondale, Arizona, house, which contained about $223,000 in cash and a vehicle loaded with 630 pounds of marijuana. The marijuana was packed with glue and grease, and Defendant had glue on his shorts and right hand at his arrest. The jury heard testimony that the conspiracy used this house to package marijuana that it then shipped to Kansas City, Missouri. It also heard testimony that the conspirators usually drove to Phoenix or Las Vegas and then returned to Kansas City by flying. Airline records showed McIntosh flew from Las Vegas to Kansas City on December 12, 2006, and March 9 and 27, 2007. Each time, he

- 7 -

flew in company with at least four other members of the conspiracy, including the ringleader, Pitter. After Defendant's arrest, Pitter put money in Defendant's jail account and tried to hire an attorney for him. Devon Thomas also testified that, before Defendant was arrested, he sometimes put Defendant's share of the drug proceeds into Defendant's bank account at Pitter's direction. ROA, vol. II at 170–71, 184–85. This evidence was sufficient for a reasonable jury to find that Defendant was involved in the drug trafficking conspiracy.

Defendant says this is not enough for several reasons. First, he asserts no evidence showed he participated in the conspiracy's objective. A conspirator must have "at least a general awareness of both the scope and the objective of the conspiracy." Acosta-Gallardo, 656 F.3d at 1123. But he need not know "of the existence or identity of the other members of the conspiracy or the full extent of the conspiracy." Id. Here, Defendant helped package a large amount of marijuana for shipment and was found in the same house that the conspiracy's ringleader had left hours before. He also traveled in company with other co-conspirators, including Pitter, from Las Vegas to Kansas City on a regular basis. A jury could easily infer that Defendant was aware the conspiracy's goal was to package and ship marijuana from Phoenix to Kansas City, Missouri.

Next, Defendant focuses on the requirement of interdependence. "Interdependence exists where each co-conspirator's activities constituted essential and integral steps toward the realization of a common, illicit goal." Foy, 641 F.3d at 465 (quoting United States v. Edwards, 69 F.3d 419, 431 (10th Cir. 1995)). That is, the defendant must have "facilitated the endeavors of other alleged co-conspirators or

facilitated the venture as a whole." Acosta-Gallardo, 656 F.3d at 1124 (quoting United States v. Heckard, 238 F.3d 1222, 1230 (10th Cir. 2001)). Defendant claims there was no evidence "other than the self-preserving testimony of Devon Thomas . . . that [Defendant] acquired his marijuana from Gladstone McDowell or Curtis Pitter." Appellant's Br. at 25. But Curtis Pitter had just left the house in which Defendant was arrested, suggesting the men were clearly connected. Furthermore, Devon Thomas's testimony may have been "self-serving," but we cannot review the jury's credibility determination on appeal. United States v. Bowen, 527 F.3d 1065, 1076 (10th Cir. 2008). The jury apparently credited Thomas's testimony, and we must leave it at that.

Defendant also claims the conspiracy would have gone on uninterrupted without him. But the interdependence element does not require Defendant to be essential to the conspiracy's operations. Rather, he need only "facilitate[] the endeavors of other alleged co-conspirators or facilitate[] the venture as a whole," Acosta-Gallardo, 656 F.3d at 1124 (quoting Heckard, 238 F.3d at 1230). We have also said co-conspirators are interdependent when they "intend to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." United States v. Fishman, 645 F.3d 1175, 1189 (10th Cir. 2011) (brackets omitted) (quoting United States v. Evans, 970 F.2d 663, 671 (10th Cir. 1992)). The evidence shows Defendant facilitated the venture as a whole by packaging marijuana for shipment and received bank deposits representing his joint share of the marijuana proceeds. This is more than adequate to show interdependence, even if Defendant was not an indispensable part of the conspiracy. See United States v. Hamilton, 587 F.3d 1199, 1209–10 (10th Cir. 2009) (holding the evidence was sufficient

to establish interdependence in a drug-trafficking conspiracy when the defendant made a one-time trip Cleveland, Ohio, to collect drug debts on behalf of the conspiracy).

Defendant makes a befuddling argument based on our recent decision in United States v. Foy. There, the defendant argued he and a co-defendant merely shared a common supplier, which is insufficient, by itself, to show interdependence. Foy, 641 F.3d at 465. We rejected his argument, concluding he and the co-defendant were partners, rather than independent sellers with a common supplier. Id. at 465–66. Defendant says this case is "unlike Mr. Foy's common supplier connection argument," because Defendant "did not share a common supplier with anyone else in the conspiracy." Appellant's Br. at 27. The logic of this argument escapes us. That Defendant chose not to raise an argument similar to the one that failed in Foy is an interesting happenstance, but certainly not a reason to reverse his conviction.

Finally, Defendant argues the flight records were inadequate to show he participated in the conspiracy. But, as we discussed already, the flight records were not the only evidence connecting Defendant to the conspiracy. Defendant also says the Government failed to prove he was the person flying under his name. He assumes the Government had to provide direct evidence that he flew in company with the other co-conspirators. But "[c]ircumstantial evidence alone is often sufficient to demonstrate interdependence." United States v. Caldwell, 589 F.3d 1323, 1329 (10th Cir. 2009). A jury could easily infer that Defendant himself, rather than an imposter, was the person who flew under his name. Thus, the jury's verdict rested on sufficient evidence.

IV.

Defendant next argues the evidence at trial varied from the indictment in two ways—the quantity of marijuana trafficked and the duration of his involvement in the conspiracy. "A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." Acosta-Gallardo, 656 F.3d at 1116 (quoting United States v. Ailsworth, 138 F.3d 843, 848 (10th Cir. 1998)). We review de novo whether a variance occurred, viewing the evidence and drawing reasonable inferences in the Government's favor. Id. A variance is only reversible error if it "affects the substantial rights of the accused." Id. (quoting Ailsworth, 138 F.3d at 848).

A.

Defendant first claims a variance existed between the quantity of marijuana charged—more than 1,000 kilograms—and the quantity proven at trial. He believes he is only responsible for the marijuana and cash seized in the Avondale house.[2] Defendant's argument overlooks the hornbook law that a conspirator is "legally responsible for the reasonably foreseeable crimes of fellow conspirators committed in furtherance of the conspiracy." United States v. Wardell, 591 F.3d 1279, 1291 (10th Cir. 2009) (citing Pinkerton v. United States, 328 U.S. 640, 647 (1946)). The evidence was more than

_____

[2] In fact he appears to argue he cannot even be held responsible for the 630 pounds of marijuana seized in the Avondale house because he had already been convicted in Arizona state court based on that drug quantity. See Appellant's Br. at 30. Of course, the Constitution does not prevent "federal prosecution of a criminal defendant who had previously been tried and convicted in state court for the same underlying conduct." United States v. Barrett, 496 F.3d 1079, 1118 (10th Cir. 2007).

adequate to show the conspiracy trafficked over 1,000 kilograms of marijuana after Defendant joined. The 630 pounds seized at the time of Defendant's arrest equates to 285 kilograms. Police also found $223,000 in cash inside the Avondale house, and seized $139,980 in the Oklahoma panhandle in November 2007 and $366,040 at a Las Vegas, Nevada, UPS store in February 2008. Devon Thomas testified that the conspiracy was selling marijuana for about $425 in profit per pound.[3] ROA, vol. II at 159–60. So these cash seizures represent profits from about 1715 pounds of marijuana, or 777 kilograms. Add to these seizures the 200 pounds (roughly 90 kilograms) of marijuana seized at the Kansas City, Kansas, UPS distribution facility in June 2009, and we have 1,152 kilograms.

Of course, Devon Thomas also testified that the conspiracy shipped about 300 pounds of marijuana twice a month once it resumed business "a month or two" after Defendant's arrest in May 2007. ROA, vol. II at 148. At this rate, it would have taken the conspiracy about eight months to traffic over 1,000 kilograms of marijuana. The conspiracy continued in operation until November 2009, meaning it easily trafficked that amount. So the facts at trial regarding the drug quantity did not vary from the indictment.

---

[3] The Government argues the profit per pound was "at most" $500. Appellee's Br. at 46. But Devon Thomas testified he *started* purchasing the marijuana for $575 per pound, and that "[a]fterwards" the purchase price dropped to "505, 510, 515" with a very rare purchase under $500. ROA, vol. II at 159. He then testified that the conspiracy sold the marijuana in Kansas City, Missouri, for $1,000 per pound "at first" and "[t]hen we came down to like 950 to 900." Id. at 160. Although we review this evidence in the light most favorable to the Government, Acosta-Gallardo, 656 F.3d at 1116, we are hesitant to assume a profit of $500 per pound, because the resale price in Missouri apparently went down as the purchase price in Arizona decreased.

B.

Defendant next argues a variance occurred regarding the length of his involvement in the conspiracy. The Superseding Indictment alleged the following:

> From in or about May, 2000 . . . and continuing to on or about November 4, 2009, both dates being approximate and inclusive in the District of Kansas and elsewhere, the defendants [names of nineteen persons, including Defendant] knowingly, and intentionally combined, conspired, confederated, and agreed together . . . to intentionally distribute and possess with intent to distribute 1000 kilograms or more of a mixture and substance containing marijuana, a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(vii).

ROA, vol. I at 76–77.

Defendant claims the indictment charged him with participating in the conspiracy for the entire nine-year period from 2000 to 2009. Read reasonably, the indictment only alleges the nineteen defendants *collectively* conspired to distribute marijuana for the nine-year period. It does not mean every defendant was involved for nine years, but only that a single conspiracy existed for that period. See Fishman, 645 F.3d at 1190 ("A single conspiracy does not splinter into multiple conspiracies because members come and go."). But even if Defendant is correct about how we should read the indictment, he cannot show prejudice.

Prejudice may result if the defendant could not have anticipated from the indictment what the evidence would be at trial, United States v. Stoner, 98 F.3d 527, 536 (10th Cir. 1996), or when the jury is more likely than not to impute evidence related to separate conspiracies to the defendant, United States v. Windrix, 405 F.3d 1146, 1154 (10th Cir. 2005). But Defendant has not shown either of these harms resulted. Nor has

- 13 -

he identified any authority requiring an indictment to detail the dates on which each member of a conspiracy joined. The only case we could find explicitly *rejected* the argument that an indictment must "allege the specific time each member joined and participated in the conspiracy." United States v. Roman, 728 F.2d 846, 852 (7th Cir. 1984). So no variance occurred with respect to the date Defendant joined the conspiracy.

Defendant next argues a disparity existed on the back end of the conspiracy because his arrest and incarceration "ended any further participation and signaled a forced withdrawal." Appellant's Br. at 33. Our precedent, however, leaves no room for this argument. Each member of a conspiracy is legally responsible for the crimes of his fellow conspirators "until the conspiracy accomplishes its goals or that conspirator withdraws." United States v. Randall, 661 F.3d 1291, 1294 (10th Cir. 2011) (quoting United States v. Brewer, 983 F.2d 181, 185 (10th Cir. 1993)). "In order to withdraw from a conspiracy an individual must take affirmative action, either by reporting to the authorities or by communicating his intentions to the coconspirators." Id. (quoting United States v. Powell, 982 F.2d 1422, 1435 (10th Cir. 1992)). Defendant bears the burden of proving a variance occurred.[4] United States v. Sells, 477 F.3d 1226, 1237 (10th Cir. 2007). Because he has not pointed to any affirmative acts by which he withdrew from the conspiracy, the law treats him as a member of the conspiracy even after his arrest.

---

[4] He would also bear the burden of proving his withdrawal if he had invoked it as an affirmative defense. Smith v. United States, 133 S. Ct. 714, 720 (2013).

V.

Defendant next argues the district court erred in sentencing him to 67 months in prison. His argument has two parts. First, Defendant argues his sentence was procedurally unreasonable because the district court erroneously found him responsible for trafficking over 1,000 kilograms of marijuana. Second, he argues the district court's sentence was substantively unreasonable. We review a sentence of imprisonment for both procedural and substantive reasonableness under an abuse of discretion standard. Gall v. United States, 552 U.S. 38, 51 (2007). In this context, "we review de novo the district court's legal conclusions regarding the guidelines and review its factual findings for clear error." United States v. Gantt, 679 F.3d 1240, 1246 (10th Cir. 2012).

A.

Defendant first asserts the district court committed clear error because Defendant "should not have any of the amounts from the Kansas conspiracy attributed to him." Appellant's Br. at 36–37. The district court adopted the Presentence Report's conclusion that Defendant was responsible for between 1,000 and 3,000 kilograms of marijuana. Under U.S. Sentencing Guideline § 2D1.1(c)(4), this yields a base offense level of 32. When determining the appropriate offense level, the district court must consider the Defendant's "relevant conduct." U.S.S.G. § 1B1.3(a). Guideline 1B1.3 says that "in the case of jointly undertaken criminal activity," relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Accordingly, we have consistently held that a defendant "may be sentenced on the basis of marijuana possessed by another

- 15 -

coconspirator, so long as the amount is within the scope of the conspiracy and foreseeable by [the defendant]." United States v. Hernandez, 509 F.3d 1290, 1298 (10th Cir. 2007) (brackets omitted) (quoting United States v. Arias-Santos, 39 F.3d 1070, 1078 (10th Cir. 1994)).  So Defendant is simply wrong that the amount of marijuana trafficked by the other conspirators during his involvement cannot be attributed to him.

Defendant also appears to argue that the district court's finding was unsupported by adequate evidence.  For example, he characterizes Devon Thomas's testimony as "unreliable" and argues that the evidence only showed him making three trips between Phoenix and Kansas City during his five-month involvement in the conspiracy.   But the district court's drug quantity determination may be an approximation, United States v. Higgins, 282 F.3d 1261, 1280 (10th Cir. 2002), and the Government need only prove it by a preponderance of the evidence, Foy, 641 F.3d at 469.  As we will explain, ample evidence supported the district court's finding here.

Defendant does not dispute the Presentence Report's conclusion that he joined the conspiracy in December 2006.  Accordingly, the Presentence Report calculated that the conspiracy trafficked 1,090 kilograms of marijuana during Defendant's involvement between December 2006 and May 2007.  Devon Thomas testified that the organization shipped 400 to 500 pounds twice a month from Arizona to Kansas City during 2006, but he did not testify regarding the amounts trafficked during the first half of 2007.  Airline records showed sixteen flights from Phoenix to Kansas City between September 2006 and May 2007, which roughly corresponded to Devon Thomas's testimony that the conspirators made marijuana shipments twice a month.  The Probation Office assumed a

conservative estimate of 200 pounds per flight, and therefore calculated 3,200 pounds shipped between September 2006 and May 2007, or roughly 355 pounds per month. Because Defendant was only part of the conspiracy for five of these nine months, the Probation Office multiplied five months times 355 pounds and arrived at 1,775 pounds. It then added the 630 pounds seized in Avondale and came up with 2,405 pounds or 1,090 kilograms.

The Probation Office's calculations rely on some questionable generalizations and assumptions. For example, they include flights in May 2007 that took place after Defendant's arrest, which really should not be counted. So it would be more accurate to take the number of return airline trips during Defendant's involvement in the conspiracy—six—and multiply that number by the estimated drug quantity. The Probation Office attributed to each of these trips only 200 pounds. But Devon Thomas's testimony supports the conclusion that the December 2006 trip involved at least 400 pounds of marijuana. And the district court could reasonably attribute 400 pounds to the five trips in early 2007 as well. Nothing suggests that the conspiracy decreased the amount of marijuana it was trafficking during early 2007. In fact, police seized 630 pounds of packaged marijuana in the back of a van in the Avondale stash house. This suggests that the conspiracy was actually shipping over 600 pounds per trip by May 2007. A conservative estimate of 400 pounds for each of the six trips during Defendant's involvement yields 2400 pounds, or 1,088 kilograms. That is without taking into account the 630 pounds seized at his arrest. So the district court did not clearly err in finding by a preponderance of the evidence that the conspiracy trafficked at least 1,000 kilograms of

marijuana between December 2006 and May 2007. Accordingly, the court also committed no procedural error because it correctly calculated Defendant's guideline range. See Gall, 552 U.S. at 51.

B.

Defendant next argues his sentence is substantively unreasonable. In reviewing for substantive reasonableness, we "afford substantial deference to the district court." United States v. Alvarez-Bernabe, 626 F.3d 1161, 1167 (10th Cir. 2010) (brackets omitted). In this case, Defendant's sentence was entitled to a presumption of reasonableness because it was within the properly calculated Guideline range. United States v. Koufos, 666 F.3d 1243, 1254 (10th Cir. 2011). This means Defendant's substantive unreasonableness argument faces a high hurdle right out of the blocks.

But the hurdle gets higher. Defendant assumes the district court could have given him a significantly lower sentence if it had accepted his argument that the proper offense level was 26, rather than 32. But he forgets the impact of the 120-month statutory minimum. 21 U.S.C. § 841(b)(1)(A). At an offense level of 32, his guideline range was 121 to 151 months. Because Defendant had served 54 months in Arizona state prison for an offense based on the same relevant conduct, the district court reduced his sentence by 54 months pursuant to U.S.S.G. § 5G1.3(b). Thus, the court imposed a sentence of 67 months, which was the equivalent of a 121-month sentence with credit for time served in state prison. Because of the statutory minimum, Defendant's guideline sentence with an offense level of 26 would have only been one month lower than the sentence he received.

We simply cannot conclude that the extra month resulted in a sentence so unreasonable that it rises to an abuse of discretion.

## VI.

Defendant's final argument is that the Government violated the Interstate Agreement on Detainers (IAD), which "establish[es] procedures for resolution of one State's outstanding charges against a prisoner of another State."[5] New York v. Hill, 528 U.S. 110, 111 (2000). The federal government, forty-eight states, and the District of Columbia have entered into the Agreement. Alabama v. Bozeman, 533 U.S. 146, 148 (2001). "The Agreement provides for expeditious delivery of the prisoner to the receiving State for trial prior to the termination of his sentence in the sending State." Id. When a detainer is lodged against a prisoner, the warden or another prison official must "promptly inform [the prisoner] of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition" of the charges. 18 U.S.C. App. 2 § 2, Art. III(c). If a prisoner requests a "final disposition" of the detainer charges, he has a right to be brought to trial within 180 days of that request. Id. Art. III(a). Even if he does not request a final disposition, the receiving state must begin the prisoner's trial "within one hundred and twenty days of the arrival of the prisoner in the receiving State, but for good cause shown in open court, the prisoner or

_____

[5] A detainer is "a legal order that requires a State in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he may be tried by a different State for a different crime." Alabama v. Bozeman, 533 U.S. 146, 148 (2001).

his counsel being present, the court having jurisdiction over the matter may grant any necessary or reasonable continuance." Id. Art. IV(c).

Here, Defendant was serving time in Arizona on a state sentence when the U.S. Marshals Service lodged a detainer against him. Defendant arrived in the District of Kansas in January 2010 but did not go to trial until April 2011, more than fourteen months later. He argues the Government violated the IAD in two ways: first, by failing to inform him of his right to request a hearing to contest his transfer, and second, by failing to bring him to trial within 120 days of his arrival in Kansas. Defendant never raised the IAD in the district court, so our review is only for plain error. Fed. R. Crim. P. 52(b). See also United States v. Gomez, 67 F.3d 1515, 1521 (10th Cir. 1995).

Defendant first argues he did not receive notice of his IAD rights. Although he asserts in his brief that he was not given a form USM-17 and informed of his IAD rights, he does not support this assertion with any evidence. He claims in his statement of facts that the "IAD document was presented to him but not explained" and cites to the record. Appellant's Br. at 5. But the record citation shows the document that was not explained to him was "Government's Exhibit No. 1," which was a document signed in August 2011 detailing the conditions of his supervised release. ROA, vol. II at 1769, 1805. This document has nothing to do with a detainer lodged in late 2009 or early 2010. Because Defendant bears the burden of establishing a plain error, United States v. Vonn, 535 U.S. 55, 59 (2002), he must at least point to *some* evidence indicating the Government violated his IAD rights. A bare assertion in an appellate brief is not enough.

Furthermore, even if the Government violated Defendant's IAD rights, he has not shown it affected his substantial rights. This is because the outcome would not be significantly different if he could prove an IAD violation. The five circuits to consider the question have held that "dismissal of the indictment is not an available remedy for a violation of the notice provisions of the Interstate Agreement on Detainers." United States v. Robinson, 455 F.3d 602, 606 (6th Cir. 2006). See also United States v. Lualemaga, 280 F.3d 1260, 1265 (9th Cir. 2002); United States v. Walker, 255 F.3d 540, 543 (8th Cir. 2001); United States v. Pena-Corea, 165 F.3d 819, 821-22 (11th Cir.1999); Lara v. Johnson, 141 F.3d 239, 243 (5th Cir. 1998). The circuits have reached this conclusion because the IAD lists dismissal as the appropriate remedy in three specific circumstances, but violation of the notice provision is not included. Lara, 141 F.3d at 243. We agree with these circuits' their interpretation of the IAD. So Defendant's claim based on the notice provision gets him nowhere.

As to Defendant's second argument, we agree with the Government that he waived his IAD rights. A defendant may waive his IAD rights by agreeing to a trial date that is later than the Agreement requires. Hill, 528 U.S. at 118 (concluding that "defense counsel's agreement to the trial date" was enough to waive the Agreement's time limits). See also United States v. Dowdell, 595 F.3d 50, 64 (1st Cir. 2010). Here, the Government moved to designate the case a complex case and to exclude all time prior to trial for purposes of the Speedy Trial Act. The Government's motion requested a trial date of October 24, 2010, well beyond the IAD's 120-day deadline. At a hearing on that motion, Defendant was present with his counsel and did not object to the later trial date.

Because he did not do so, he waived his right to go to trial within 120 days of his arrival in the District of Kansas.

AFFIRMED.

Entered for the Court,


Bobby R. Baldock
United States Circuit Judge